IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| GREGORY D. VANG, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | 4:17CV3039 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| NANCY A. BERRYHILL, Acting | ) | **AND ORDER** |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff brings this action under Title II of the Social Security Act ("Act"), which provides for judicial review of "final decisions" of the Commissioner of the Social Security Administration. 42 U.S.C. § 405(g) (Westlaw 2017).

## I. NATURE OF ACTION & PRIOR PROCEEDINGS

### A. Procedural Background

Plaintiff filed an application for disability benefits on October 9, 2015. (Filing No. 12-5 at CM/ECF pp. 188-189.) The claim was denied initially (Filing No. 12-4 at CM/ECF pp. 113-116) and on reconsideration (Filing No. 12-4 at CM/ECF pp. 118-121). On October 19, 2016, following a hearing, an administrative law judge ("ALJ") found that Plaintiff was not under a "disability" as defined in the Act. (Filing No. 12-2 at CM/ECF pp. 9-27.) On January 19, 2017, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. (Filing No. 12-2 at CM/ECF pp. 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. *Sims v. Apfel*, 530 U.S. 103, 107 (2000) ("if . . . the Council denies the request for review, the ALJ's opinion becomes the final decision").

## B. Factual Background

The Defendant agrees with Plaintiff's statement of facts, which are set forth verbatim below:

> In his application for disability benefits, plaintiff stated that he was born on May 4, 1965,[1] and that he became unable to work on July 8, 2014. (Filing No. 12-5, at CM/ECF p. 188). The plaintiff testified that he last worked in maintenance at a Wal-Mart distribution center. (Filing No. 12-2, at CM/ECF p. 36-37). He has performed no substantial and gainful work activity since the date of his alleged onset of disability, July 8, 2014. (Filing No. 12-2, at CM/ECF p. 12).
>
> At his hearing the plaintiff stated that he completed high school for his level of education. (Filing No. 12-2, at CM/ECF p. 36).
>
> Plaintiff's has past relevant work consisted of working in loss prevention and store maintenance. (Filing No. 12-2, at CM/ECF p. 36-37).
>
> The plaintiff alleged disability due to degenerative disc disease of the thoracic and lumbar spine with residuals of surgery; carpal tunnel syndrome ("CTS"); and obesity. (Filing No. 12-2, at CM/ECF p. 14).
>
> The plaintiff has a history of lumbar disc surgery prior to his alleged onset date of disability. (Filing No. 12-2, at CM/ECF p. 40). Then, in May of 2012, the plaintiff injured his thoracic spine while doing heavy lifting on the job. (Filing No. 12-5, at CM/ECF p. 195). An MRI performed in June of 2012 revealed right mid thoracic disc herniation impinging on the spinal cord. However, no abnormal signal within the spinal cord was observed. (Filing No. 13-1, at CM/ECF p. 440). Further, despite this, the plaintiff continued to work into the month of July. At that time, the plaintiff reported that he stopped working due to radiating

---

[1] Making the plaintiff 49 years old as of the date that his disability began or a younger individual. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.00(h)(1).

pain, numbness, and weakness in his legs. (Filing No. 13-1, at CM/ECF p. 432). An MRI study of the lumbar spine was also performed at that time, which revealed degenerative changes at L4-5, with post-operative changes causing some narrowing of the left lateral recess and left neural foramen. (Filing No. 13-1, at CM/ECF p. 439). The plaintiff was examined in March of 2015. There, he was noted to have undergone a previous fusions [sic] and discectomy of the thoracic spine in March of 2013. During this examination, in March of 2015, an updated MRI of the thoracic spine was obtained. The study revealed no significant canal or foraminal changes through T4. At T4-5, canal stenosis was found to be mild and no significant canal or foraminal changes could be seen through the remainder of the thoracic spine. At the time of this examination, the plaintiff was noted to have a BMI of over 42, which is consistent and supportive of his diagnosis of obesity. Further upon exam, despite his obesity, he was noted to have a normal cardiovascular examination; he was fully alert and oriented; and his coordination was normal. (Filing No. 13-5, at CM/ECF p. 775-778).

The plaintiff was also referred to Lincoln Orthopedic Physical Therapy for a functional capacity evaluation by licensed occupational therapist Mr. Bruce Bednar, OTR/L, CHT, CWCE, in July of 2014. There, Mr. Bednar determined that the plaintiff was best suited for light work, and that his strength and endurance would continue to improve "at some point in the future." The plaintiff was noted to have restrictions in squatting, bending, and kneeling to an occasional basis. He was also limited to crouching and stooping on an "infrequent basis;" and he was limited to occasional overhead reaching with frequent forward reaching. Mr. Bednar also opined that the plaintiff would be able to sit or stand for 1-2 hours at a time and may require short rest breaks to relieve pain. (Filing No. 13-4, at CM/ECF p. 558-559).

Upon examination by Mr. Bednar in July of 2014, the plaintiff demonstrated full grip strength bilaterally. He was noted to be able to walk for six minutes with a normal pace and gait pattern. He was able to kneel for three full minutes. He was able to complete 10 squats. He demonstrated a full range of motion with reaching both forward and overhead, and he passed all balancing tests with his left and right lower extremities. Moreover, he was noted to be able to push and pull with a

sustained force of 30 pounds and a maximum force of 40 pounds, he was observed carrying a tote weighing 20 pounds on an occasional basis, and he did not demonstrate any neurological weakness in his bilateral lower extremities; however, he did report some diminished sensation extending along the right rib cage from his thoracic spine around the right side to his front mid section. (Filing No. 13-4, at CM/ECF p. 560-565).

It should be noted that Mr. Bednar was of the opinion that the plaintiff could not engage in frequent lifting or carrying. (Filing No. 13-4, at CM/ECF p. 566).

During an examination from December of 2015, the plaintiff was found to be obese, but respiratory and cardiovascular exams were normal. Further, a sensory exam was normal; his muscle bulk and tone were normal; he was found to have normal muscle strength in all areas tested; and his coordination was normal. (Filing No. 13-7, at CM/ECF p. 884-886). During a separate exam from December of 2015, the plaintiff was noted to have a normal gait and normal posture. Further, at that time, an exam of the lumbar spine revealed normal strength and tone, no laxity or crepitus, no spasms, and no known fractures or deformities. Moreover, straight leg raise testing was negative. (Filing No. 13-7, at CM/ECF p. 881-883).

The plaintiff has been clinically diagnosed with bilateral CTS, and these diagnoses have been confirmed thought [sic] EMG and NCV studies. Said studies revealed mild right median neuropathy at the wrist and moderately severe left median neuropathy at the wrist. However, no evidence of right or left ulnar neuropathy was noted, and as mentioned, the plaintiff was able to demonstrate full grip strength during testing in June of 2016. (Filing No. 13-7, at CM/ECF p. 916).

The plaintiff presented for a follow-up examination in April of 2016, where he continued to report significant back pain. At that time, he demonstrated positive straight leg raise testing on the left with evidence of L5 type radiculopathy, and he was noted to have range of motion deficits in his lumbar spine. However, an examination of his thoracic spine was "relatively unremarkable." (Filing No. 13-7, at CM/ECF p. 939-940).

The State agency examiners' opinions were that the plaintiff would be able to lift 10 pounds frequently, and 20 pounds occasionally; that he could stand, walk and sit for 6 hours out of an 8 hour work day; that he could never climb ladders, ropes or scaffolds, but could occasionally climb ramps or stairs, stoop, crouch, kneel and crawl. (Filing No. 12-3, at CM/ECF p. 89-98 and 100-111).

The plaintiff testified that he cannot be on his feet for enough time to perform his past work because of back spasms in his lower back and upper back and with the cramping that he has in his hands. (Filing No. 12-2, at CM/ECF p. 40). He testified that the pain level he experiences based on a 0 to 10 scale with 10 being the worst is 5-6 even though he avoids activity such as lifting, pulling, pushing and bending which aggravates his pain, and that even with these precautions, it will rise to a level of 8 or 9. He further noted that recently he had climbed three flights of stairs which caused the pain level to go to 8 or 9 and that the pain level caused him to lie down for two hours before the pain level started to subside. It was his testimony that these rises in pain level to 8 or 9 were occurring about twice a week. (Filing No. 12-2, at CM/ECF p. 41-42).

The plaintiff also testified that he has an upper back pain of 3 or 4 on the 10 point scale in the rib cage area. He noted that the pain in that area can be triggered to a level of 8 or 9 by lifting or carrying something and his pain level is increased. When these rises in pain occur, they can require two to three hours to subside after lying down. He reported these problems occurring every three to six weeks. (Filing No. 12-2, at CM/ECF p. 46-48).

The plaintiff also described the problem caused by his carpal tunnel syndrome ("CTS"). He explained that it causes cramping and pain with use of his hands. As a recent example he described that just spending about 3 minutes the day before skinning a fish, he experienced severe cramping and a pain level of between 7 and 8. He also had a similar experience the day before the fish skinning when he was picking up a bunch of nuts and bolts that he had dropped to the ground. (Filing No. 12-2, at CM/ECF p. 49-51).

Similarly, the plaintiff testified as to the difficulty he has standing in one place like the kitchen counter or kitchen sink. After about 10 minutes he needs to go to his recliner because of pain in his back. (Filing No. 12-2, at CM/ECF p. 51). The back problem also limits his ability to sit in a straight back chair like a kitchen chair or an office chair. It was his testimony that such activity was limited by the pain to an hour to an hour and 15 or 20 minutes when it would become necessary to move around. He noted that eventually he would need to lie down in order to get the needed relief. (Filing No. 12-2, at CM/ECF p. 52-53).

The plaintiff described a typical day as starting around 8:30 or 9:00 in the morning with him having a cup of coffee with his wife prior to her leaving to go to her shop where she runs a taxidermy business. (Filing No. 12-2, at CM/ECF p. 54). He testified that he might go down to his wife's shop for an hour or two and visit with her or answer the phone for her until he becomes too uncomfortable at which time he returns home and goes to his recliner for relief. He said that the time in the recliner is a rotation between sitting in the upright and reclined positions. (Filing No. 12-2, at CM/ECF p. 55-56).

The plaintiff testified that he is not able to perform domestic chores throughout the day because of his pain. He gets things out of the refrigerator for lunch and he works with his wife's 20 year old daughter to prepare the evening meal. (Filing No. 12-2, at CM/ECF p. 56-57). After dinner he will watch recorded TV shows with his wife while sitting in his recliner in either the upright or reclined position until retiring for bed at 10:00. He stated that he has trouble getting to sleep which might take until 1:00 or 2:00 to doze off even though he takes Ambien and Tizanidine to help him achieve his sleep. He stated that on average he only gets around three hours of sleep overnight and does not wake refreshed in the morning. (Filing No. 12-2, at CM/ECF p. 58-59).

The plaintiff testified that he is no longer able to pursue hunting, fishing and trapping which he avidly participated in. He even mentioned that the fish he was skinning was a bass caught by a neighbor boy. (Filing No. 12-2, at CM/ECF p. 59).

It was the testimony of the plaintiff that between 8:00 in the

morning and 5:00 in the afternoon he is only able to stand in one place for a total of an hour; that he can walk around for about two hours and that he spends about four hours in his recliner split about equally between upright and reclined. He said that roughly four to five hours is spent reclining during that time. (Filing No. 12-2, at CM/ECF p. 60-61).

(Filing No. 18 at CM/ECF pp. 2-8 (hyperlinks added).)

**C. The ALJ's Opinion**

Following the five-step sequential analysis for determining whether an individual is "disabled" under the Social Security Act, 20 C.F.R. § 404.1520, the ALJ concluded in relevant part:

(1) Plaintiff has not engaged in substantial gainful activity since July 8, 2014.

(2) Plaintiff's severe impairments of degenerative disc disease of the thoracic and lumbar spine with residuals of surgery, carpal tunnel syndrome, and obesity did not meet or equal the severity of one of the listed impairments under the Act such that disability could be established on the medical facts alone.

(3) Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 CFR § 404.1567(b), except Plaintiff is able to kneel, crouch, and crawl only occasionally; is able to stoop and twist the trunk about three times each hour (twisting being defined as rotating so that the plane of the shoulder is at an angle of at least 45 degrees in relation to the neutral position); is able to handle and finger bilaterally on a frequent basis; and is able to reach overhead occasionally. Further, if Plaintiff is required to sit or stand for at least one hour, then he requires the freedom to stretch and flex for two minutes before returning to work. In addition, if Plaintiff is required to walk more than 600 yards at a time, he requires the freedom to take a break to stretch or flex for two minutes before resuming work.

(4) Plaintiff is unable to perform his past relevant work as a store detective.

(5) Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as an information clerk, routing clerk, and mail clerk, dictating a finding of "not disabled."

(Filing No. 12-2 at CM/ECF pp. 15-22.)

## II. ISSUES ON APPEAL

Plaintiff asserts that the ALJ erred in (1) "failing to incorporate all of the plaintiff's documented limitations from the functional capacity evaluation performed by Bruce Bednar at Lincoln Orthopedic Physical Therapy which caused him to be found to be not disabled"; and (2) failing to properly apply *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), in "determining the credibility of the plaintiff's subjective allegations of his physical and mental condition as to his limitations, restrictions and work-like activity." (Filing No. 18 at CM/ECF pp. 10-11.)

## III. STANDARD OF REVIEW

The court may reverse the Commissioner's findings only if they are not supported by substantial evidence or result from an error of law. *See Gann v. Berryhill*, 864 F.3d 947, 950 (8th Cir. 2017); *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012); 42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. In determining whether evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. If substantial evidence supports the Commissioner's conclusion, the court may not reverse merely because substantial

evidence also supports the contrary outcome and even if the court would have reached a different conclusion. *Gann*, 864 F.3d at 950.

A court should disturb the ALJ's decision only if it falls outside the available "zone of choice," and a decision is not outside that zone of choice simply because the court may have reached a different conclusion had the court been the fact-finder in the first instance. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *see McNamara v. Astrue,* 590 F.3d 607, 610 (8th Cir. 2010) (if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome"). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions of the Social Security Administration." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

## IV.  DISCUSSION

### A.  Bednar's Functional Capacity Evaluation

The ALJ explicitly gave "some weight" to the opinion of occupational therapist Bruce Bednar that Plaintiff was capable of light work[2]; his strength and endurance would continually improve; he was restricted to occasional squatting, bending, and kneeling, infrequent crouching and stooping, occasional overhead reaching, and frequent forward reaching; and Plaintiff could sit or stand for 1-2 hours at a time, but may require short rest breaks to relieve pain.  The ALJ noted that limiting Plaintiff to

---

[2]The applicable regulations define light work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." SSR 83-10.

9

light work was consistent with Plaintiff's MRI studies, his prior surgeries, and Bednar's examination of Plaintiff. (Filing No. 13-3 at CM/ECF pp. 23-31.)

Plaintiff asserts that the ALJ erred by failing to incorporate all of his documented limitations from Bednar's evaluation. Specifically, Plaintiff argues that the ALJ's finding that Plaintiff can perform light work is inconsistent with Bednar's Functional Capacity Evaluation, which, according to Plaintiff, states that Plaintiff "would be unable to 'frequently' lift or carry any amount, much less 10 pounds as required by the regulations to perform light work." (Filing No. 18 at CM/ECF p. 14.)

Bednar's evaluation does contain a chart indicating that Plaintiff can frequently carry "0 lb" (Filing No. 13-3 at CM/ECF p. 31) and his "safe weight" for frequent lifting above and below his waist is "0 lbs" (Filing No. 13-3 at CM/ECF p. 29). Notably, the ALJ did not mention or rely on Bednar's lifting/carrying restrictions, perhaps because Bednar's ultimate conclusion that "the client demonstrates ability to perform work in the Light physical demand level on a full time basis" (Filing No. 13-3 at CM/ECF p. 24) would necessarily mean that Plaintiff could lift or carry up to 10 pounds on a frequent basis under SSR 83-10, and Bednar's lifting/carrying restrictions conflicted with that.

However, even if Bednar's functional capacity evaluation contains an internal inconsistency regarding lifting and carrying restrictions, the ALJ was bound to consider the evidence as a whole, and substantial evidence in the record as a whole supports the ALJ's conclusion that Plaintiff can engage in light work—that is, he can frequently lift and carry objects weighing up to 10 pounds. This evidence includes:

> • The opinion of reviewing physician Robert M. Roth, M.D. (to which the ALJ accorded "some weight"), who stated that Plaintiff could meet the demands of light work, including frequently lifting and carrying up to 10 pounds. (Filing No. 12-3 at CM/ECF p. 8.) *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008) (in determining RFC, ALJ was entitled to consider evidence as a whole

and determine that plaintiff's alleged mental impairments were of the severity described by psychologist, rather than by plaintiff himself); *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (ALJ must assess claimant's RFC based on all relevant evidence); *Baker v. Colvin*, 620 F. App'x 550, 552 (8th Cir. 2015) (unpublished) (ALJ properly gave little weight to treating physician's assistant's RFC opinion when other physicians' medical opinions contradicted RFC opinion); *Lynch v. Astrue*, 687 F. Supp. 2d 841, 865 (N.D. Iowa 2010) ("the ALJ is not required to view only the results of the FCE, but may also look at all of the relevant evidence"); 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."); SSR 96-6P, 1996 WL 374180 (July 2, 1996) (state agency medical consultants are experts in social security disability programs, and ALJs are required to consider their findings of fact about the nature and severity of an individual's impairment as opinions of nonexamining physicians; while ALJ is not bound by such findings, they may not ignore them).

• In March 2015, Plaintiff was referred to Alan R. Brewer, M.D., of Great Plains Pain Management for an examination and MRI of his thoracic spine. Dr. Brewer noted Plaintiff's statement that his back pain was exacerbated by lifting over 20 pounds; that Plaintiff had a prior discectomy and fusion at the T6/T7 level; and that Plaintiff's increasing pain in his brachial lumbar area was "consistent with referred pain from the deconditioning of his abdominal muscles." The MRI revealed no significant canal or foraminal changes through T4. At T4-5, canal stenosis was mild, and no significant canal or foraminal changes were seen throughout the remainder of the thoracic spine. (Filing No. 13-5 at CM/ECF pp. 56-59.)

• In December 2015, Jason M. Citta, M.D., reported that Plaintiff exhibited normal coordination, muscle bulk and tone, and full muscle strength (Filing No. 13-6 at CM/ECF p. 39). Another December 2015 examination of Plaintiff by

11

Kristina M. Downing, APRN, showed normal gait and posture and no neurological abnormalities. The exam showed Plaintiff's neck had a full range of motion; his lower back had normal strength and tone; he exhibited normal posture and gait; and he had no muscle spasms. Plaintiff had normal back flexion and extension and no pain with straight leg raising. Plaintiff's gait had a normal step length, walking speed, mechanics, and velocity. Plaintiff's hips had a normal range of motion with no tenderness or pain (Filing No. [13-6 at CM/ECF pp. 41](13-6 at CM/ECF pp. 41)-42).

• In an April 2016 examination in which Plaintiff complained of increased back and left leg pain, Douglas Beard, M.D., stated that Plaintiff's prior diagnostic studies could not explain Plaintiff's allegedly worsening symptoms. While Plaintiff showed a positive straight leg raise on the left, his thoracic spine was relatively unremarkable. Plaintiff had a limited range of motion in his lumbar spine, but normal flexion, abduction, and external rotation (Filing No. [13-7 at CM/ECF pp. 22](13-7 at CM/ECF pp. 22)-26).

Because this court must "defer heavily to the findings and conclusions" of the Social Security Administration, *[Hurd v. Astrue](Hurd v. Astrue)*, 621 F.3d at 738, and because the above-described evidence supports the ALJ's conclusion that Plaintiff has the residual functional capacity to perform light work—meaning he can frequently lift and carry 10 pounds—this court may not reverse the ALJ's decision, even if "inconsistent conclusions may be drawn from the evidence." *[McNamara,](McNamara)* 590 F.3d at 610. Accordingly, I am not persuaded by Plaintiff's argument that the ALJ erred by failing to incorporate the lifting/carrying restriction from Bednar's functional capacity evaluation.

## B. Plaintiff's Allegations of Pain & Activity Level

Plaintiff argues that the ALJ's finding that Plaintiff is not disabled "was not based on substantial evidence because it was not based on an RFC which incorporated

all of the problems and limitations identified by the plaintiff"—specifically, "plaintiff's relevant complaints of pain." (Filing No. 18 at CM/ECF p. 17.)

Social Security Ruling ("SSR") 16-3p[3] states that in "considering the intensity, persistence, and limiting effects of an individual's symptoms," the ALJ[4] must consider "the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, 2016 WL 1119029, Titles II & XVI: Evaluation of Symptoms in Disability Claims (S.S.A. Mar. 16, 2016). With regard to an individual's statements about their symptoms, such as pain, the ALJ must "evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id.* If a claimant's statements are inconsistent with objective medical evidence, the ALJ "will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively . . . ." *Id.*

SSR 16-3p discusses the ALJ's obligation to explain "which of an individual's symptoms we found consistent or inconsistent with the evidence in his or her record" and "how our evaluation of the individual's symptoms led to our conclusions." The

---

[3]SSR 16-3p became effective on March 28, 2016, and it supersedes SSR 96-7p. With this change, the SSA "eliminat[ed] the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." SSR 16-3p, 2016 WL 1119029, Titles II & XVI: Evaluation of Symptoms in Disability Claims (S.S.A. Mar. 16, 2016).

[4]The relevant regulations and Social Security Rulings repeatedly refer to "we" and "us"—terms that refer to the Social Security Administration or the state agency making the disability determination. 20 C.F.R. § 404.1502(j). In the above discussion, I have substituted the word "ALJ" for "we" and "us."

13

SSR directs the ALJ to "consider the consistency of the individual's own statements," including those made during other disability-claim proceedings, in the objective medical evidence, and in other evidence in the record. The ALJ's determination in this regard "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."

Finally, SSR 16-3p states that ALJs are not to "assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. . . . Rather, [the ALJ] will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the [ALJ's] evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities."

While SSR 16-3p eliminates the "credibility finding" requirement, it incorporates [20 C.F.R. §§ 404.1529](...) and [416.929](...), which address how the SSA evaluates symptoms, including pain. These regulations provide that the ALJ will consider factors relevant to the claimant's alleged pain, including daily activities; the location, duration, frequency, and intensity of pain; precipitating and aggravating factors; and medication and other treatment the claimant has used to alleviate pain—the familiar [*Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)](...), factors.

Here, the ALJ discussed the regulatory factors for evaluating Plaintiff's claims regarding the intensity, persistence, and limiting effects of his pain and gave specific reasons for concluding that Plaintiff's symptoms did not prohibit Plaintiff from performing light work. Specifically, the ALJ found that the clinical and objective findings in the record, as well as Plaintiff's activity level, were inconsistent with Plaintiff's alleged pain being completely disabling, citing the following evidence:

- Plaintiff testified that he "tends to his own personal hygiene needs, plays a musical instrument as a hobby, helps care for the family dog, and helps run errands and answer phone calls for his wife in the operation of her taxidermy business . . . [and] admits he is able to operate a motor vehicle independently, he watches television daily, and is able to manage his own finances." (Filing No. 12-2 at CM/ECF p. 16.)

- Plaintiff's testimony regarding his activities conflicted with that of his spouse. Plaintiff's spouse reported that Plaintiff did not run errands for her taxidermy business, but Plaintiff said that he "goes to the [taxidermy] shop, 'hangs out' with [his wife], answers phones, and runs errands for her regularly." (Filing No. 12-2 at CM/ECF p. 19.)

- Several "factors" tended to "detract from his testimony as to how much he actually participates in this business."

   > For example, he indicated in a stipulated worker's compensation settlement that he 'assists his wife in a taxidermy business.' Finally, he admitted that he recently climbed three flights of stairs, but used a freight elevator to come back down to what he called 'our shop,' before quickly changing his testimony to 'where Marla's business is.' Moreover, this level of stair climbing is inconsistent with the general thrust of his testimony that he lies down four to five hours per day and spends a large portion of his day in a recliner.

   (Filing No. 12-2 at CM/ECF p. 18.)

- Plaintiff testified that he has not gone hunting since 2011, but his wife stated that one of Plaintiff's hobbies is hunting, and Plaintiff reported that his dog is trained for hunting. (Filing No. 12-2 at CM/ECF p. 18.)

- Despite Plaintiff's reports of hand cramping and weakness, "there were very

few mentions of hand cramping in the record. He reported hand cramps in May of 2016 during one appointment, but did not mention them in the several appointments thereafter in the following months. Further, there is no indication that he has ever actually been treated [f]or left neuropathy of the wrist." (Filing No. 12-2 at CM/ECF p. 18.)

• None of Plaintiff's treating physicians submitted a medical source statement supporting Plaintiff's allegations of total disability, and Plaintiff "has been noted to have no side effects from medication on multiple occasions." (Filing No. 12-2 at CM/ECF p. 18.) Further, as discussed in detail above regarding Plaintiff's Functional Capacity Evaluation, the examinations and diagnostic studies contained in Plaintiff's administrative record support Plaintiff's performance of light work, not total disability.

Because the ALJ's evaluation of Plaintiff's subjective complaints of pain was based on the entire record; reflects consideration of the appropriate factors; explains reasons for finding Plaintiff's alleged level of pain to be inconsistent with other evidence in the record; and is supported by substantial evidence, I find no merit in Plaintiff's argument that the ALJ did not incorporate all of Plaintiff's pain allegations in making his RFC determination.

## V. CONCLUSION

For the reasons explained above, I find the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

Accordingly,

IT IS ORDERED:

1. Plaintiff's Motion for an Order Reversing the Commissioner's Decision

(Filing No. 15) is denied.

      2.      Defendant's Motion to Affirm the Commissioner's Decision (Filing No. 19) is granted.

      3.      The Commissioner's decision is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).

      4.      Judgment will be entered by separate document.

DATED this 7th day of December, 2017.

                                BY THE COURT:
                                s/ *Richard G. Kopf*
                                Senior United States District Judge